530 PJH

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name  _Ruiz_          _Felipe_          _Rosales_
           (Last)            (First)           (Initial)

3

4    Prisoner Number  _F.08621_
     _Pelican Bay State Prison_
5    Institutional Address  _P.O. Box 7500,  Crescent City, CA. 95532_

     **F I L E D**

     JUL - 3 2008

6    ================================================================
7    **UNITED STATES DISTRICT COURT**     RICHARD W. WIEKING
     **NORTHERN DISTRICT OF CALIFORNIA**   CLERK, U.S. DISTRICT COURT
                                           NORTHERN DISTRICT OF CALIFORNIA

8    _Felipe Rosales Ruiz. F.08621_                          08        3215 (PR)
     (Enter the full name of plaintiff in this action.)
9

10                  vs.                        Case No. _____
                                               (To be provided by the clerk of court)
11   _____
                                               **PETITION FOR WRIT**
12   _____          **OF HABEAS CORPUS**

13   _____

14   _____
     (Enter the full name of respondent(s) or jailor in this action)
15

16   ================================================================
     Read Comments Carefully Before Filling In

17   When and Where to File

18          You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS          - 1 -

1    <u>Who to Name as Respondent</u>

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11        1. What sentence are you challenging in this petition?

12            (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14        *MERCED CouNTy SupERioR CouRT, MERCED*

15                   Court                                    Location

16            (b)    Case number, if known *No. 279032790*

17            (c)    Date and terms of sentence *98 To LiFE*

18            (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                   parole or probation, etc.)            Yes *X*      No _____

20                   Where?

21                   Name of Institution: *PELICAN BAY STATE PRISON*

22                   Address: *PO·Box 7500   CRESCENT CiTY, CA. 95532*

23        2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   *PC 664/197, PC. 246. PC. 12021(A)(1), PC. 664/187, PC. 246*

27   *PC. 245 (A)(2), PC. 12021(A)(1), PC. 12022.53(D), PC. 12022.53(C)*

28   *PC. 12.22.5(A)(1), PC.12022.7(A), PC. 186.22 (B)(S), (B)(4).*

PET. FOR WRIT OF HAB. CORPUS       - 2 -

3. Did you have any of the following?

    Arraignment:                   Yes __✗__    No _____

    Preliminary Hearing:          Yes __✗__    No _____

    Motion to Suppress:          Yes __✗__    No _____

4. How did you plead?

    Guilty _____    Not Guilty __✗__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __✗__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?           Yes _____    No __✗__

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment            Yes __✗__    No _____

    (b)    Preliminary hearing     Yes __✗__    No _____

    (c)    Time of plea           Yes __✗__    No _____

    (d)    Trial                 Yes __✗__    No _____

    (e)    Sentencing            Yes __✗__    No _____

    (f)    Appeal               Yes __✗__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No _____

8. Did you appeal your conviction?      Yes __✗__    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal          Yes __✗__    No _____

        Year: _2007 – 2008_ Result: ___DENIED_____

        Supreme Court of California    Yes ~~✗~~    No _____

        Year: ~~_____~~ Result: ~~_____~~_____

        Any other court          Yes _____    No _____

        Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1           petition?                  Yes _X_     No____

2       (c)    Was there an opinion?      Yes _X_     No____

3       (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                            Yes ____     No_X_

5           If you did, give the name of the court and the result:

6           _____

7           _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?       Yes ____     No _X_

10       [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16       (a)    If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding.  Attach extra paper if you need more space.

18         I.    Name of Court: _____

19               Type of Proceeding: _____

20               Grounds raised (Be brief but specific):

21               a._____

22               b._____

23               c._____

24               d._____

25               Result: _____Date of Result:_____

26         II.   Name of Court: _____

27               Type of Proceeding: _____

28               Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS     - 4 -

1      a._____

2      b._____

3      c._____

4      d._____

5      Result: _____Date of Result:_____

6   III. Name of Court: _____

7     Type of Proceeding: _____

8     Grounds raised (Be brief but specific):

9      a._____

10      b._____

11      c._____

12      d._____

13      Result: _____Date of Result:_____

14   IV. Name of Court: _____

15     Type of Proceeding: _____

16     Grounds raised (Be brief but specific):

17      a._____

18      b._____

19      c._____

20      d._____

21      Result: _____Date of Result:_____

22  (b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

23           Yes ____  No X

24    Name and location of court: _____

25 **B. GROUNDS FOR RELIEF**

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27 support each claim. For example, what legal right or privilege were you denied? What happened?

28 Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS  - 5 -

1  need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One: THE CONVICTION IN COUNT "2" UNDER SECTION 246 MUST BE REVERSED FOR INSUFFICIENT

6  EVIDENCE THAT APPLLANT FIRED AT A MOTOR VEHICLE.

7  Supporting Facts: SEE ATTACHED OPENING BRIEF.

8

9

10

11  Claim Two: THE ENHANCEMENT UNDER SECTION 186.22 MUST BE REVERSED FOR INSUFFICIENT EVIDENCE

12  THAT APPELLANT PARTICIPATED IN A " CRIMINAL STREET GANG."

13  Supporting Facts: SEE ATTACHED OPENING BRIEF.

14

15

16

17  Claim Three: THE COURT VIOLATED APPELLANT'S SIXTH AMENDMENT JURY TRIAL RIGHT

18  AT THE SENTENCE HEARING.

19  Supporting Facts: SEE ATTACHED OPENING BRIEF.

20

21

22

23       If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 6 -

Case 3:08-cv-03215-PJH   Document 1   Filed 07/03/2008   Page 7 of 42

1      List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4         *SEE ATTACHED OPENING BRIEF.*

5

6

7  Do you have an attorney for this petition?                Yes_____    No_X_

8  If you do, give the name and address of your attorney:

9

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _6 · 2 · 08_

14           Date                      Signature of Petitioner   *F.0364*

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS    - 7 -

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent,

v.

FELIPE ROSALES RUIZ,

Defendant and Appellant.

_____/

F049430

Merced County
Superior Court
No. 2790327906

Appeal from a Judgment of Conviction
The Honorable Frank Dougherty, Judge

**PPELLANT'S OPENING BRIEF**

Barbara Michel
State Bar No. 95503
P.O. Box 12535
Berkeley, California 94712
Telephone (510) 841-4338

Attorney for Appellant
Pursuant to the "Independent"
Case Program of the Central
California Appellate Program

## TABLE OF CONTENTS

STATEMENT OF APPEALABILITY                                              1

STATEMENT OF THE CASE                                                   1

STATEMENT OF FACTS                                                      4

    The Prosecution, Counts 1, 2 and 3                              4
    Counts 4-9                                                      6
    The Gang Evidence                                               9
    The Defense                                                    11

ARGUMENTS                                                              15

I.    THE CONVICTION IN COUNT 2 UNDER                              15
    SECTION 246 MUST BE REVERSED FOR
    INSUFFICIENT EVIDENCE THAT APPELLANT
    FIRED AT A MOTOR VEHICLE.

II.   THE ENHANCEMENTS UNDER SECTION                               19
    186.22 MUST BE REVERSED FOR
    INSUFFICIENT EVIDENCE THAT APPELLANT
    PARTICIPATED IN A "CRIMINAL STREET GANG."

III.  THE COURT VIOLATED APPELLANT'S                               24
    SIXTH AMENDMENT JURY TRIAL RIGHT
    AT THE SENTENCE HEARING.

CONCLUSION                                                            29

CERTIFICATE OF WORD COUNT                                             29

DECLARATION OF SERVICE

-i-

# TABLE OF AUTHORITIES

*Cases*

| | |
|---|---|
| Apprendi v. New Jersey (2000) 530 U.S. 466 | 24, 25, 28 |
| Auto Equity Sales, Inc., v. Superior Court (1962) 57 Cal.2d 450 | 26 |
| Blakely v. Washington (2004) 542 U.S. 296 | 24, 25, 26, 27, 28 |
| Burks v. United States (1978) 437 U.S. 1 | 24 |
| Cunningham v. California (cert. gr. Feb. 21, 2006, No. 05-6551 [74 USLW 3457]) | 25 |
| Jackson v. Virginia (1979) 443 U.S. 307 | 18, 24 |
| People v. Black (2005) 35 Cal.4th 1238 | 25, 26 |
| People v. Chavira (1970) 3 Cal.App.3d 988 | 17 |
| People v. Cotton (1991) 230 Cal.App.3d 1072 | 26, 27 |
| People v. Cropper (1979) 89 Cal.App.3d 716 | 26, 27 |
| People v. Cruz (1995) 38 Cal.App.4th 427 | 17 |
| People v. Gardeley (1996) 14 Cal.4th 605 | 22 |
| People v. Iran (1999) 74 Cal.App.4th 826 | 24 |
| People v. Johnson (1980) 26 Cal.3d 557 | 18, 24 |
| People v. Mercer (1999) 70 Cal.App.4th 463 | 24 |
| People v. Perez (2004) 118 Cal.App.4th 151 | 21, 22, 23 |
| People v. Rowland (1992) 4 Cal.4th 238 | 18 |
| People v. Scott (1994) 9 Cal.4th 331 | 26, 27 |
| People v. Sengpadychith (2001) 26 Cal.4th 316 | 21, 22 |
| People v. Snow (2003) 30 Cal.4th 43 | 18 |
| People v. Stepney (1981) 120 Cal.App.3d 1016 | 15, 17, 18 |
| People v. Stratton (1988) 205 Cal.App.3d 87 | 27 |
| People v. Williams (1998) 16Cal.4th 635 | 24 |
| United States v. Booker (2005) 543 U.S. 220 | 24 |

*Penal Code Sections*

| | |
|---|---|
| 136.1 | 20 |
| 186.22 | 2-3, 19, 20, 21, 23, 24 |
| 245 | 20, 23 |
| 245, subdivision (a)(2) | 2, 20, 23 |

Table of Authorities, continued

*Penal Code Sections, continued*

| | |
|---|---|
| 246 | 2, 15, 16, 20, 23 |
| 246.3 | 3 |
| 459 | 20, 23 |
| 664/187 | 2 |
| 1170, subdivision (b) | 25 |
| 1237 | 1 |
| 12021, subdivision (a)(1) | 2 |
| 1022.5, subdivision (a)(1) | 2 |
| 12022.53, subdivision (c) | 2 |
| 12022.53, subdivision (d) | 2 |
| 12022.7, subdivision (a) | 2 |

*Health and Safety Code Sections*

| | |
|---|---|
| 11378 | 20 |
| 11379 | 20 |

*Vehicle Code Sections*

| | |
|---|---|
| 10851 | 20 |

*California State Constitution*

| | |
|---|---|
| Article I, section 15 | 18 |

*United States Constitution*

| | |
|---|---|
| Fifth Amendment | 24 |
| Sixth Amendment | 24 |
| Fourteenth Amendment | 18 |

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

PEOPLE OF THE STATE OF CALIFORNIA,         F049430

    Plaintiff and Respondent,         Merced County
                                Superior Court
v.         No. 2790327906

FELIPE ROSALES RUIZ,

    Defendant and Appellant.

_____/

### **APPELLANT'S OPENING BRIEF**

#### **STATEMENT OF APPEALABILITY**

This appeal arises from a jury trial resulting in a conviction and judgment which finally disposed of all the issues between the parties. It is authorized pursuant to Penal Code section 1237.

#### **STATEMENT OF THE CASE**

The case arose out of two separate incidents in which witnesses identified appellant Felipe Rosales Ruiz as the man who shot one person, in the first incident, and shot at three others, in the second one. Appellant was charged, in a consolidated Information thrice-amended and filed August 29, 2005, with nine felonies. Counts 1, 2 and 3 concerned an incident on October 31, 2002, as follows:

Count 1. Attempted murder of Oscar Garcia Cervantez, in violation of section[1] 664/187.

Count 2. Shooting at an occupied motor vehicle, in violation of section 246.

Count 3. Possession of a firearm by a felon, in violation of section 12021, subdivision (a)(1).

Counts 4-9 concerned an incident on November 28, 2002, as follows:

Count 4. Attempted murder of James Jackson, in violation of section 664/187.

Count 5. Shooting at an inhabited dwelling, in violation of section 246.

Counts 6, 7 and 8. Assault with a firearm, on James Jackson, Corey Nelson, and Adrian Jynes, respectively, in violation of section 245, subdivision (a)(2).

Count 9. Possession of a firearm by a felon, in violation of section 12021, subdivision (a)(1).

Personal discharge of a firearm causing great bodily injury, within the meaning of section 12022.53, subdivision (d), was alleged as to counts 1 and 2; personal use of a firearm, within the meaning of section 12022.53, subdivision (c), was alleged as to counts 4 and 5, and within the meaning of section 12022.5, subdivision (a)(1), as to counts 1, 6, 7 and 8. Personal infliction of great bodily injury, within the meaning of section 12022.7, subdivision (a), was alleged as to counts 1 and 2. Acting for the benefit of, etc., a criminal street gang, was alleged with respect to counts 1 and 2, and 4-8, within the meaning of section 186.22, subdivision s (b)(5), (b)(4),

---

[1] Statutory references are to the Penal Code.

-ii-

(b)(5), (b)(4), (b)(1)(c), (b)(1)(c), and (b)(1)(c), respectively. (3CT[2] 725.)

Appellant pled not guilty and denied the allegations. (1CT 184.) A trial by jury began June 27, 2005. (2CT 510.) On September 2, the 18th day of trial, the jury returned verdicts finding appellant guilty as charged in counts 1, 2, 3, 4, 6, 7, 8 and 9, and guilty of negligent discharge of a firearm, in violation of section 246.3, a lesser-included offense of that charged in count 5. The jury found all enhancements true. (3CT 762.)

Appellant appeared for sentencing on December 12, 2005. (3CT 848.) At that time, the court denied his motions for new trial, to dismiss for failure to disclose exculpatory evidence, and to dismiss for outrageous police misconduct. (3CT 775, 794, 808.) The court then sentenced appellant as follows:

Count 1: 15-Life, enhanced by 25-Life, consecutive.

Count 2: 15 years, enhanced by 25 years, all concurrent to count 1.

Count 3: 2 years, concurrent.

Count 4: 15-Life, enhanced by 20 years, consecutive.

Count 5: 8 months, consecutive.

Count 6: 3 years, enhanced by 10 years, all stayed under section 654.

Count 7: 4 years, enhanced by 14 years, all consecutive.

Count 8: 1 year, enhanced by 3 years and 4 months, all consecutive.

Count 9: 2 years, consecutive.

The total prison term imposed was 55-to-life, plus 45 years. (3CT 725, 855.)

---

[2]

"CT" refers to the clerk's transcripts and "RT" to the reporter's transcripts, which are further designated by volume number, e.g., "1CT" and "1RT".

-iii-

Appellant filed a timely notice of appeal on the day of sentence.
(3CT 849.)

## STATEMENT OF FACTS

### The Prosecution, Counts 1, 2 and 3.

Counts 1, 2 and 3 arose out of an incident on October 31, 2002,
Halloween, when Oscar Garcia Cervantez was sitting in his car at 8th and M
Streets, in Merced, waiting for his friend Miguel Huerta. Appellant
approached and asked Garcia Cervantez where he was from. Appellant
said, "I don't bang, nothing." He asked Garcia Cervantez what he was
doing there, and Garcia Cervantez replied that he was waiting for his friend.
Then appellant said he was a Southerner, called Garcia Cervantez a
"fuckin' scrap," pulled up his shirt, took out a pistol and shot Garcia
Cervantez in the face, on the arm, and on his knee. (1RT 114-116.)
Fearful for the safety of his family, Garcia Cervantez did not immediately
notify the police about the identity of his assailant. (1RT 117, 121.)

Garcia Cervantez was not in a gang. He had three dots on his hand
but that is something that everyone in Mexico has, and means "my crazy
life." (1RT 173-176.)

Josephina Romero was at her home at 554 West 8th Street that
evening when she heard yelling. She looked across the street and saw
appellant, who was a neighbor of hers, arguing with someone in a car.
Then he pulled out a gun and fired it from a distance of about four feet.
(1RT 178, 180, 189.) She was afraid to testify for fear that her family
would be hurt if she did, because of what happened to her sister: someone
"did a drive-by on her house." Romero herself received threats: about six
months after the shooting, some guys walked by her house and made

-iv-

shooting signs at her with their fingers. (1RT 182, 184.)

On January 17, 2003, almost two months after the shooting, Josephina gave a statement to the police regarding the shooting. (Exhibit 122A; 2CT 556; 4RT 756.)

Micaela Romero, Josephina's sister, was also at home when she saw appellant approach Garcia Cervantez, who was sitting in his car with the car door open. Appellant pulled a gun from his waist, pointed it towards Garcia Cervantez and fired four or five shots. At first, he shot with his right hand, but then he switched to his left hand as he ran towards his home. (2RT 225, 226, 228-243.)

Micaela decided to come forward after her husband, Oscar Fernandez, a former Norteno, was arrested for the crime, and she did not want to see him go to prison for something he did not do. At first, she was afraid to appear in court on the matter, because a relative warned her husband that if she did, something would happen to her. Also, on July 18, shortly after trial began, someone went by her house and started shooting, and she was almost hit. By the time of trial, she was in the witness protection program. (2RT 233-236.)

Micaela is an associate of MGC. Josephina is not, although she does associate with gang members. (3RT 502.) Oscar Fernandez and Miguel Hernandez were validated gang members as of the October 31, 2002, incident. (*Ibid.*)

Robert Badillo Hernandez, who was ten years old at the time, also witnessed the shooting from the porch of a house at 541 West 8th Street. He saw two people walk across the street, stop and say something. Then one of them opened the [car] door and another one shot Garcia Cervantez, who was inside the car. He heard more than one shot. (1RT 195-197.)

-v-

Officer Daniel Dabney made diagrams of the scene, including blood trails. (1RT 205-209.) He also collected evidence, including fingerprints, teeth and tooth or bone fragments and blood. (*Id.*,at 210-215, Exhibits 102-121.)

**Counts 4-9.**

On November 28, 2002, Johnny Serena was on M Street, between 7th and 8th Streets, and witnessed a shooting. (2RT 320.) There were three black guys arguing with two Mexican guys, one of whom was appellant, who went into an apartment complex in the alley, then returned with a gun, which he shot several times at the black guys. Two of them ran off in one direction while the third one ran in the other direction. (2RT 323-325.) Appellant pointed his gun directly at the two of them the first time he fired, and then directly at the third one the second time, holding the gun at eye level. (2RT 326-328.)

That night, appellant admitted to Detective Martin that he shot at the men. (2CT 359.)

Andres Ortega Bravo, appellant's nephew, self-identified as a Norteno and had a tattoo on his right arm that said "DEL," which stands for Dead End Locs. Bravo testified that he was present during the incident, along with a Mr. Sandoval, Imelda Radillo, Roxanne Gonzalez, and appellant. Three black guys came walking down M Street. At that time, there were shootings going back and forth between the Nortenos and the Merced Gangster Crips, and the Black guys had identified themselves as Crips. Sandoval said, "What's up?" and they responded with the same. Bravo and Sandoval then began arguing with them until they called a truce. Bravo thought everyone would then just go their way. (2RT 343-344.)

However, after Sandoval and Bravo had shaken hands with the Black

-vi-

guys, appellant came out of the alley between N and M Streets riding a bike and carrying a gun. He went past everyone and asked the Blacks if they were Crips, then told them to hold on. (2RT 342, 344-346.) Appellant went into his house and came out and stood about 20 feet away with a gun, which was pointing down. The two groups backed up from each other, then appellant fired one shot and the Black guys ran off, two running together and one running a different way. (2RT 347.) Appellant walked to the alley and shot once in the two directions they had run, but without aiming. (2RT 348.)

Bravo had told appellant he had called it "cool" with the guys, and tried to stop him from shooting, telling him to calm down, because the guys were not from the area. The Black guys kept picking up their pants, as if they were getting ready to fight, but Bravo never saw gun in any of their hands. Appellant, however, who Bravo identified as a Norteno, said they were Crips. Afterwards, appellant told Bravo that he had "fucked up." (2RT 348-350.)

James Lynn Jackson, who is a Crip, was walking to the store with his two brothers, Adrian and Corey, when two Mexican guys whom Jackson thought may have been Nortenos approached and said something like, "Come here." They asked if James and his brothers were Crips. Someone made reference to "Merced Ghetto Boys." An argument started but was resolved. The next thing Jackson knew was that a shot was fired. He and his brothers ran, splitting up, and more shots were fired. He never saw the person who fired the gun. (2RT 365-368, 372.) Jackson learned later that he had received an injury to his face. (2RT 369-370.)

69-year-old Aricell Washington lived at 564 West 8th Street, in Merced. On November 28, at about 4:40 in the afternoon, she heard

gunshots being fired, and the sound of one of her bedroom windows breaking. (4RT 662.)

Police Officer Jerry Horn received a phone call at 4:40 p.m. regarding a shooting, and responded to the area, where he and Sergeant Matthew Williams confirmed the presence of a bullet hole in Ms. Washington's window. Horn knew appellant was a gang member who was on probation at the time, so he went to appellant's home and conducted a search of it pursuant to appellant's probation conditions, finding expended shell casings and a revolver in the trash can in the bathroom. (3RT 377-379, 6RT 633.) Horn also responded to an earlier shooting, on October 31, at 8th and M Streets, where he found Oscar Garcia Cervantez, who had been shot in the mouth, his knees, and one of his arms. (3RT 383-384.)

Duane Lovaas, a criminalist, identified Exhibit 134 as a .39-caliber revolver which probably fired a bullet, which he also examined. (4RT 592-593.) A latent print examiner, Richard Kinney, was unable to find any fingerprints of value on the revolver. (4RT 605-608.)

Pursuant to stipulation, a taped conversation was played for the jury, and a transcript thereof handed to the jurors. (Exhibits 168 and 168a.) The conversation was between appellant and someone named Manuel Jimenez, and originated from the Merced County jail facility on June 20, 2005. (3CT 610; 4RT 626-627.)

The following evidence was also admitted by stipulation: Sergeant Gorman interviewed appellant regarding possession of a handgun when he was a minor. Officer Chapman conducted a probation search at the home of Luis Canela, with whom appellant shared a room. Officer Struble found a knife with a red bandana wrapped around it in the room, and also saw some gang writing in the room, and new gang tattoos on appellant's hand.

-viii-

Officer Koe conducted a probation search at appellant's home and saw
validated gang members present. On another occasion, appellant told him
that he associated with the Dead End Locs and the Merced Ghetto Boys,
and showed Koe his new gang tattoos. Dr. Caton treated Oscar Garcia
Cervantez for multiple gunshot wounds to the mouth, arm and legs; he was
missing several teeth. (3RT 629-631.)

Detective Scott Skinner interviewed appellant and took photographs
of various tattoos on appellant's body, showing that several new ones had
been added after November 28, 2002, including "12 Street," "West Side,"
and a tattoo behind his left ear with the initials "MGB" and "12th Street."
(6RT 650-653.)

### The Gang Evidence.

Sergeant Thomas Trinidad was assigned to the Special Operations
Unit of the Merced Police Department, which was responsible for
suppression of gang activity. (3RT 397.) He testified regarding the
concepts of "jumping in", and respect in the gang culture, which can be
attained by committing a violent act. Commission of a violent act may
benefit a gang member as well as the gang because of the fear that it
generates in the community. (3RT 406-407.) It also helps the member who
commits the act get ahead in the gang. (3RT 409.)

Merced Ghetto Boys, or MGB, is a criminal street gang within the
city of Merced, comprised mostly of Hispanics. Westside Merced and Dead
End Locs are other ones. Twelfth Street is part of MBG. (*Ibid.*) These
gangs interact to the extent that individuals who are actually in a certain
gang such as Dead End or Westside Merced or Merced Ghetto Boys will
simply claim "Norteno", which is basically any Hispanic gang member

-ix-

from Northern California. Nortenos claim the color red and the number 14, and are aligned with Nuestra Familia, a prison gang. "Surenos" are southerners who come from Southern California, claim the color blue and the number 13, and are tied to the Mexican Mafia, which is another prison gang. (3RT 410-411, 418.)

The Merced Ghetto Boys (MBG), which has about 25 or 30 members, usually go into Dead End Locs when they get older. At the time of trial, their rivals were Surenos, but they have been rivals with the Merced Gangster Crips, and in 2002 there were numerous violent altercations and shootings between the two. (3RT 412-414.)

Trinidad identified a series of photographs of members of the Merced Ghetto Boys and Dead End Locs, including one of appellant wearing red and throwing up the Westside hand sign. (3RT 415-420, 423-428.) Of the members, Trinidad had arrested Nicholas Saldana, and knew that Luis Canela had been to CYA. He had recently arrested Canela for intimidation of a witness. (3RT 421.)

Based on contacts and police reports, as well as appellant's own admission to another officer, and various tattoos on his body, Trinidad testified that appellant is a member of the Merced Ghetto Boys. (3RT 429-431, 439-440.)

Trinidad prepared various exhibits, including a map of the area of 8th, 7th and Canal Streets, showing various "shooting incidents" between MGB, Sureno gangs and the Merced Gangster Crips. (3RT 435.)

In Trinidad's opinion, the primary activities of the Merced Ghetto Boys were aggravated assault, assault with a firearm, shooting at an inhabited dwelling, drug sales, especially methamphetamine, witness intimidation, auto theft, and residential and commercial burglary. (3RT

-x-

436.) Exhibit 158 is a certified copy of an abstract of judgment showing that one Elidoro Martinez was convicted of violating sections 245(a)(2) and 459, with personal use and gang enhancements. (3RT 437.) Exhibit 159 is a certified copy of an abstract of judgment showing that appellant was convicted of section 459, burglary. (3RT 437.)

Trinidad opined that the shooting of Oscar Garcia Cervantez and the subsequent shooting at James Jackson, Corey Nelson and Adrian Jynes were both definitely done for the benefit of the Merced Ghetto Boys, with the specific intent to promote criminal gang activity. (3RT 441, 442-443.)

Criminalist Duane Lovaas identified People's Exhibit 134, a revolver, along with a bullet which matched it. (4RT 592-593.) No fingerprints of any value were found on the revolver. (4RT 605-607.)

### The Defense.

Detective Richard Rentfrow interviewed Oscar Garcia Cervantez at the hospital on October 31, 2002. Garcia Cervantez told him there were two people who shot him. He was in the car, working on the gauges, when one of them opened the door. Words were exchanged, then one of them tried to hit him in the head with his fist, and missed. Then he heard gunshots. Rentfrow did not recall if Garcia Cervantez said it was the same person or not who swung at him and also fired the shots. The first suspect was a thin Hispanic male, about 5'8", 19 years old, with short hair, medium complexion, and wearing black clothing. The other suspect was about 16 years old, darker, about 5'6", chubby, and wearing a gray sweat shirt and white t-shirt. Both suspects looked as if they were trying to grow mustaches. (4RT 675-676, 680.)

Detective Ray Sterling testified that Garcia Cervantez said the chubby suspect was the one who did the shooting. (4RT 715, 716.)

-xi-

According to Sterling, Garcia Cervantez looked at a photo lineup with appellant's photo in it some time after November 26, and said "No, that's not him." (*Id.*, at 720.) He did not identify appellant by name as the shooter until three or four weeks later. (*Id.*, at 718.)

Recalled as a defense witness, Garcia Cervantez did not recall telling the police that Oscar Fernandez drove appellant and a young man named Chango, also known as Manuel Jimenez, away from the scene. (4RT 688, 742.) Nor did he remember most of the conversations he had with the police. (4RT 692.) Garcia Cervantez' taped and transcribed statement to the police, made February 4, 2003, was provided to the jury by stipulation. (Exhibit 209A; 3CT 639; 4RT 698.) In the statement, he said "Felipe" was the one who shot him, and that Chongo was with him. (3CT 646.) Then they left in a car which Oscar (presumably Fernandez) seemed to be driving. (*Id.*, at 647.)

The parties stipulated that Micaela Romero told an investigator for the District attorney's Office that she had been sitting on her mother's couch while her sister, Josephine, was walking out the front door. She saw appellant and another guy. Appellant was shooting a gun. The parties further stipulated to have Micaela's statement, which was taped and transcribed, provided to the jury. (Defense Exhibits 210 and 210A; 4RT 700.)

Defense counsel argued that the person or persons who shot Garcia Cervantez were Oscar Fernandez and his cousin Tootie. (5RT 871-872.)

Appellant told Detective Martin that he shot at Jackson and his brothers because he felt threatened. He heard arguing, and then they came towards appellant and his friend as if they were going to pull out something from beneath their clothing. He was pretty sure they were gang-related.

-xii-

Appellant had been shot at before, and saw something shiny by their waistband. He did not know what it was, but had a gun in his pocket for protection, pulled it out, and pointed it just over their shoulders. He had never before shot a gun in his life. He fired one shot, but they continued to stand there, so he fired again, several times, and they left. (2CT 362-367, 374, 375, 377, 382.)

The parties stipulated to the following:

1. Prior to the incidents at issue, appellant expressed interest in tattoo removal and in going to a tattoo removal program with his probation officer, James Rubis, and also with Robert Jenkins.

2. The recordings of telephone calls placed by inmates at the Merced County Sheriff's Department between September 30, 2003, and August 25, 2005, no longer existed as of the time of trial, and there were no records showing which calls were monitored or recorded.

3. Appellant shared a cell with other inmates in the main jail from April, 2005, to June 23, 2005.

4. No expended bullets were located at the October 31, 2002, crime scene other than in the vehicle in which Garcia Cervantes was sitting when he was shot.

5. Appellant is left-handed.

6. The distance from the far back corner of the porch at 541 West 8th Street is 46 feet and two inches to the spot where the shooter stood during the incident of October 31, 2002.

7. The distance between the base of the front door of Micaela Romero's residence and the place where the shooter stood when the shots were fired on October 31, 2002, is 81 feet and three inches; the area where the shooter stood was six feet and one inch to the east, or right, of the

-xiii-

diagram (Defense Exhibit 201); the house at the top of the diagram with a
red dot in the middle of it was the Hernandez home in front of which Garcia
Cervantez had been parked; and that the residence at the bottom of the
diagram was occupied by Micaela and Josephine Romero and Oscar
Fernandez. (4RT 752-755, 756.)

//

## ARGUMENTS

### I.

## THE CONVICTION IN COUNT 2 UNDER SECTION 246 MUST BE REVERSED FOR INSUFFICIENT EVIDENCE THAT APPELLANT FIRED AT A MOTOR VEHICLE.

In count 2, the Information charged that appellant "did willfully and unlawfully and maliciously discharge a firearm at an . . . occupied motor vehicle," in violation of section 246. (3CT 725.) The evidence showed that as Oscar Garcia Cervantez sat in his car fixing his fuses, appellant approached and the two exchanged words. Then appellant pulled up his shirt, took out a pistol, opened the door, and fired. (1RT 115-116.)

In *People v. Stepney* (1981) 120 Cal. App. 3d 1016, the defendant challenged the statutory interpretation and judgment of the Superior Court of Contra Costa County (California), that convicted appellant of discharging a firearm at an inhabited dwelling in violation of section 246, which prohibited discharging a firearm at an inhabited dwelling. The evidence showed that defendant had fired a bullet into a television set while standing in the living room of a dwelling. He contended that section 246 only prohibits shooting at the specified structures or vehicles from the outside; the People read the statute more broadly, and argued that it prohibits shooting at the listed targets from inside or out.

The court agreed with the defense. The court noted the fundamental rule of statutory construction, which is that the court ascertain legislative intent so as to effectuate the purpose of the law, and also the prohibition against creating an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. (*Id.*, at 1019, citations deleted.) If the court perceives an ambiguity in the statute, the

-xv-

court continued, "it is well settled that the court must construe that ambiguity in favor of the defendant. When language reasonably susceptible of two constructions is used in penal law, ordinarily that construction more favorable to the defendant will be adopted. The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute. (*Ibid.*, citation deleted.)

The defendant argued that section 246 should be interpreted to conclude that it only forbids shooting at the specified structures and vehicles from the outside. The court observed that even if it could be argued that one can shoot at a building or automobile from within as well as from without, the ambiguity must be construed in favor of appellant, unless to do so would result in an absurdity which the Legislature should not be presumed to have intended. (*Ibid.*, citation omitted.)

"Other than the statutory language itself," the court continued, "there are few clues to legislative intent. Both appellant and the People point out that as originally proposed, section 246 forbade discharging a weapon into a dwelling, but in the bill as enacted, into was changed to *at.* (1 Assem. J. (1949 Reg. Sess.) p. 1760.) Appellant reads that change as intended merely to enable prosecution of those who discharge a weapon at a building but miss; the People, on the other hand, read that prepositional change was intended to enable prosecution of all those who shoot at a building, regardless of whether they fire from outside in or inside out, hit or miss." (*Ibid.*, emphasis added)

The court observed that the defendant's explanation was supported by documentation circulated in the Legislature at the time of the statute's enactment. The documentation included a letter including a letter from the Assistant District Attorney of Alameda County to the Governor's legislative

-xvi-

secretary, explaining that the bill was sponsored by the District Attorneys'
and Peace Officers' Associations. The letter states in part: 'This bill defines
a new crime by making it unlawful to discharge a firearm at an inhabited
dwelling house or occupied building. . . . [P] The need for the bill arises
from the increasing frequency of shootings into homes by reckless,
irresponsible and malicious persons. Prosecution has always presented a
problem where dwellings were temporarily unoccupied or where the
defense made a point about lack of intent to assault anyone by such
conduct.' . . . We recognize that this letter does not represent the intent of
the Legislature, as it is neither a statement of a legislator nor a report to the
Legislature from the bill's proponents. It does, however, evidence what law
enforcement groups wanted when they proposed the statute, which is
something different than the People are urging here." (*Id.* at 1020, fn. 4,
citation omitted.)

    Thus, in amending the statute, the Legislature's use of the word "*at*"
expanded the reach of the statute by covering those situations in which the
shooter's aim was bad or whose intent was questionable. (See also *People
v. Cruz* (1995) 38 Cal.App.4th 427, 432 (intent to hit a building is not
necessary where shot fired at a building); *People v. Chavira* (1970) 3 Cal.
App. 3d 988, 993 (shots fired at individuals who were outside building were
fired with reckless disregard of the possibility of hitting the building and
thus constituted a violation of section 246). Use of the word "*at*" thus
indicates a legislative intent to include perpetrators who fire into an
inhabited dwelling from the outside.

    The *Stepney* court found "no state statute explicitly prohibiting the
discharge of a firearm inside a residence or for that matter within any public
place," (*ibid.*), and concluded "that the firing of a pistol *within* a dwelling

-xvii-

house does not constitute a violation of Penal Code section 246," (*id*., at 1021.)

In the case at bench, the evidence was clear that appellant fired his weapon only after he opened the door to the car in which Garcia Cervantez was sitting. Under the logic expounded in *Stepney, supra*, such evidence does not support an interpretation that he fired *at* an occupied motor vehicle.

The proper test to determine a claim of insufficiency of the evidence in a criminal case is whether, on the entire record, a rational trier of fact could find a defendant guilty beyond a reasonable doubt beyond a reasonable doubt. (*People v. Snow* (2003) 30 Cal.4th 43, 65, citing *People v. Johnson* (1980) 26 Cal.3d 557, 576-578; and *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) Without substantial evidence of each element of an offense, a defendant's right to due process under the Fourteenth Amendment of the United States Constitution and under article I, section 15 of the California Constitution, are violated. (*Jackson v. Virginia, supra*, 443 U.S. at 313-314; *People v. Rowland* (1992) 4 Cal.4th 238, 269-270.)

Wherefor, the conviction in count 2 for shooting at an occupied motor vehicle must be reversed.

//

## II.
## THE ENHANCEMENTS UNDER SECTION 186.22 MUST BE REVERSED FOR INSUFFICIENT EVIDENCE THAT APPELLANT PARTICIPATED IN A "CRIMINAL STREET GANG."

Appellant's sentences for counts 7 and 8, assault with a firearm, were each enhanced under section 186.22, subdivision (b)(1)(c), which enhances penalties by ten years for persons who participate in criminal street gangs. As used in section 186.22, "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Sec. 186.22, subd. (f).)

Sgt. Trinidad provided most of the gang testimony, and identified appellant as a member of the Merced Ghetto Boys. (RT 429.) Twelfth Street, another gang, is part of MBG. (RT 409.) Luis Canela, Nicholas Saldana, Gilbert Ruiz, Adrian Torres and Mark Orozco were also validated members of Merced Ghetto Boys, as were Gerardo Rodriguez and Eldorio Martinez. (RT 420, 424.) Some of them have committed crimes, and although Trinidad did not know which specific crimes, he had recently arrested Luis Canela for intimidation of a witness. (RT 421.)

The parties stipulated that Officer Koe would have testified that appellant admitted associating with Dead End Locs as well. (RT 630-631.)

Trinidad testified that Jaime Fierra is a validated Dead End Loc gang

-xix-

member, and committed "a 245 or sorry, 246 PC which is drive-by shooting and also a firebomb." In the year 2000, in Merced Police Department Case No. 2000-1993, appellant was arrested for being a minor in possession of a firearm. In the year 1998, in Case No. 34531, he was contacted regarding a theft involving gang members Andres Luna, Jesus Quintero, Serena, Mario Gonzalez, Angel Cervantes, Epifano Manzo and Raul Aguirre. In 2001, Case No. 31554, he was arrested in a 10851, stolen vehicle. In Case No. 2001-3375, he was arrested for burglary. (3RT 427, 429-430.)

In Trinidad's opinion, the primary activities of the Merced Ghetto Boys were: "crimes surrounding 245 of the California Penal Code which is aggravated assault; 246 which is shooting at an inhabited dwelling. They're also involved in sales of drugs, primarily methamphetamine, 11378 and 11379 of the Health and Safety Code. They're also involved in witness intimidation, 136.1 PC of the California Penal Code. They've also been involved in auto theft, 10851 of the California Vehicle Code. And they've also been involved in residential and commercial burglary, 459 of the California Penal Code." (3RT 436.)

Trinidad identified Exhibit 158 as a certified abstract of judgment showing that Elidoro Martinez was convicted of violating section 245(a)(2), assault with a firearm, and section 459, burglary of a motor vehicle, with a gang enhancement under section 186.22(b)(1), and Exhibit 159 as a certified copy of an abstract of judgment in Case No. 26080 showing that appellant was convicted of violating section 459, burglary. (3RT 437.)

Trinidad reviewed a phone call made by appellant while he was in jail to Manuel Jimenez in which, in Trinidad's opinion, appellant asked Jimenez to "get at" the witness Micaela Romero, meaning to persuade her not to testify. After that, Romero's house was shot at, and she received a

-xx-

phone call from an anonymous source telling her not to testify. Jimenez then told Trinidad that appellant wanted him to "get at the witnesses." (3RT 564-565.)

In *People v. Perez* (2004) 118 Cal. App. 4th 151, the court reversed an enhancement under section 186.22(b)(1) for insufficient evidence. The prosecutor offered evidence that the defendant belonged to the Crazy Latin Boys, or "CLB", a Long Beach gang, and that another member, Martin Mendoza, had been shot to death during a gun battle in Long Beach with members of an Asian gang. The next day, three Asian gang members were shot near the area of East 20th Street, Long Beach. Two days later, on February 18th, an Asian teenager was shot near East 15th Street, Long Beach. The police did not know if the latter victim was a gang member, although there was Asian gang graffiti in the area. A police officer testified that when the youth was asked who shot him, he stated, "CLB." Long Beach Latino and Asian gangs had been enemies for 10 or 15 years. As well, an officer testified that he had investigated crimes committed by the CLB gang, including the attempted murder of a young Asian boy approximately six years earlier. (*Id.*, at 156-157.)

> "'To trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute ... . [P] ... [P] Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities.' (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322, 323.) 'The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's "chief" or "principal" occupations. [Citation.] That definition would necessarily

-xxi-

> exclude the occasional commission of those crimes by the
> group's members.' ( *Id.* at p. 323.) 'Sufficient proof of the
> gang's primary activities might consist of evidence that the
> group's members consistently and repeatedly have committed
> criminal activity listed in the gang statute. Also sufficient
> might be expert testimony, as occurred in [ *People v.*]
> *Gardeley* [(1996)] 14 Cal.4th 605[, 620]. There, a police gang
> expert testified that the gang of which defendant Gardeley had
> for nine years been a member was primarily engaged in the
> sale of narcotics and witness intimidation, both statutorily
> enumerated    felonies. [Citation.]' (*Sengpadychith, supra*, at
> p. 324.)" (*People v. Perez, supra*, at 159-160.)

The *Perez* court observed that no expert testimony such as that

provided in *Gardeley, supra*, was presented, but that "Even if we assume

that the CLB gang was responsible for the shootings of Asians on February

16 and 18, as well as the shooting of Siuva C., such evidence of the

retaliatory shootings of a few individuals over a period of less than a week,

together with a beating six years earlier, was insufficient to establish that

'the group's members consistently and repeatedly have committed criminal

activity listed in the gang statute.' ( *People v. Sengpadychith, supra*, 26

Cal.4th at p. 324.) In the absence of proof of this element of the criminal

street gang allegation, the finding on the allegation must be stricken."

(*Perez, supra*, at 160.)

Appellant acknowledges the *Gardeley* court's conclusion that expert

opinion could satisfy the sufficiency requirement, but asserts that Trinidad's

testimony was not sufficient. To begin with, Trinidad was never qualified

as an expert, as it appears the motion, though made, was never ruled upon.

(See 3RT 405-406.) Although the record fails to show why the court did

not so qualify Trinidad, perhaps it was because the court was concerned

with defense counsel's allegation that Trinidad "is not familiar with the data

-xxii-

that is kept by the Merced Police Department, nor does he personally keep track of data as it relates to the element of primary activity. . . . There may be other officers in the Merced Police Department gang unit that can properly offer these opinions. The court as gatekeeper must make sure the prosecutor's witness is an expert who is qualified to render the opinions that the prosecutor seeks to introduce." (2CT 400-401.)

More significantly, perhaps, Trinidad was unable to recall with specificity any particular crime by a member of the Merced Ghetto Boys, except that Jaime Ferreira "committed a 245 or sorry, 246 PC which is drive-by shooting and also a firebomb," for which no documentation or further details were provided; that Elidoro Martinez was convicted of violating section 245(a)(2), assault with a firearm, and section 459, burglary of a motor vehicle, with a gang enhancement under section 186.22(b)(1); and that appellant was convicted of violating section 459, burglary. (3RT 437.) All other references to crimes committed by Merced Ghetto Boy members were mere allegations, based upon arrests, and not supported by convictions or by certified documentation of convictions.

As in *Perez, supra*, this testimony – even when coupled with documentation of the convictions suffered by Martinez and appellant, and Trinidad's interpretation of telephonic hearsay to the effect that appellant practiced witness intimidation – is simply insufficient to support Trinidad's opinion, as quoted above, that the Merced Ghetto Boys' primary activities consisted of criminal acts enumerated in the statute. The evidence was insufficient to establish that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.

When considering a claim based on sufficiency of the evidence, the appellate court must review the whole record in the manner most favorable

-xxiii-

to the judgment to determine whether that judgment is supported by
substantial evidence. (*People v. Iran* (1999) 74 Cal.App.4th 826, 830;
*People v. Mercer* (1999) 70 Cal.App.4th 463, 465-466.) "Substantial
evidence" is evidence that is credible and of solid value, from which a
rational trier of fact could have found in favor of the prosecution beyond a
reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320;
*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

When there is no substantial evidence to support the judgment,
retrial is barred by principles of double jeopardy. (*Burks v. United States*
(1978) 437 U.S. 1, 10-11; U.S. Const., Amend. V; *People v. Williams*
(1998) 16 Cal. 4th 635, 690, fn. 22 .)

Wherefor, the enhancements under section 186.22(b)(1) must be
stricken.

//

## III.

### THE COURT VIOLATED APPELLANT'S SIXTH AMENDMENT JURY TRIAL RIGHT AT THE SENTENCING HEARING.

In *Blakely v. Washington* (2004) 542 U.S. 296, 305, the Supreme
Court held that Washington's determinate sentencing scheme violated the
defendant's Sixth Amendment right to jury trial to the extent that it
permitted the use of judicial fact-finding to impose a sentence which
exceeded the statutory maximum. (See *Apprendi v. New Jersey* (2000) 530
U.S. 466, 490 [any fact other than a prior conviction, used to elevate
punishment of a crime above the "prescribed statutory maximum" must be
found true by a jury beyond a reasonable doubt]; *United States v. Booker*
(2005) 543 U.S. 220, 230 [federal sentencing guidelines construed as
advisory to preserve constitutionality].)

In *People v. Black* (2005) 35 Cal.4th 1238, the defendant challenged an upper term sentence and consecutive sentences as violative of the *Apprendi/Blakely* requirement that a defendant in a criminal case is entitled to a jury trial on any fact which increases the maximum sentence to which the defendant is exposed for a particular offense, unless that fact has been admitted by the defendant, or is based on the defendant's prior convictions. (*Black, supra*, 35 Cal.4th at 1246.)  Because California's sentencing scheme requires the court to impose the middle term "unless there are circumstances in aggravation or mitigation of the crime" (sec. 1170(b)), the defendant argued that the middle term was the statutory maximum sentence absent additional facts, which must be found by the jury.  The California Supreme Court concluded that California's three-tier determinate sentencing scheme "simply authorizes] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range."  (*Id.*, at 1254.) Consequently, the upper term is the "prescribed statutory maximum" for *Blakely* purposes and the use of judicial fact-finding to impose the upper term does not, according to the California Supreme Court, violate the defendant's jury trial right.  (*Ibid.*)

However, the United States Supreme Court has since granted certiorari in *Cunningham v. California*, (cert. gr. Feb. 21, 2006, No. 05-6551 [74 USLW 3457]), to consider whether California's determinate sentencing law complies with the constitutional right to trial by jury.  At the moment of the writing of this brief, *Cunningham* has yet to be decided.

Appellant therefore wishes to preserve the issue through this appeal.

The sentencing hearing of December 12, 2005, is reported herein at 3CT 859-871.  The record reflects that at that time, the court made the

following sentencing choices which appellant believes violate *Blakely*:

– The decision to impose sentence upon count 4, attempted murder of James Jackson, consecutive to the time imposed on other counts. (3CT 867.)

– The decision to impose sentence upon count 5, negligent discharge of a firearm, consecutive to the time imposed on other counts. (*Ibid.*)

– The decision to impose sentence on counts 7 and 8, assault with a firearm, consecutive to the time imposed on other counts. (*Id.*, at 867-868.)

– The decision to impose the upper term of four years on count 7, assault with a firearm. (3CT 867.)

Appellant acknowledges that defense counsel made no objection to the sentence under *Blakely*, and that sentencing defects are waived unless challenged at the sentence hearing. (*People v. Scott* (1994) 9 Cal.4th 331.) A defense attorney who does not properly understand and argue at sentencing is subject to a finding of ineffectiveness. (*Id.*, at 351.) In the instant case, defense counsel's failure to object to the court's choice of consecutive and upper terms is inexcusable. Although the California Supreme Court's decision in *Black, supra*, had been issued several months prior to the sentencing hearing, and is binding on all California state courts (see *Auto Equity Sales, Inc., v. Superior Court* (1962) 57 Cal.2d 450), reasonably competent counsel would have known that the *Black* decision was arguably in contravention of *Blakely*, and made an objection on the record to preserve the issue.

The duty of counsel involving disposition or sentencing includes advocating for the client. (*People v. Scott, supra*, Cal.4th 331, 351; *People v. Cotton* (1991) 230 Cal.App.3d 1072, 1085-1087; *People v. Cropper* (1979) 89 Cal.App.3d 716, 719-721.) Where the defendant's interest

-xxvi-

appears on the record, that interest should not be assumed to have been abandoned as a reasoned tactical choice. (See, e.g., *Cropper, id.*; cf., *People v. Stratton* (1988) 205 Cal.App.3d 87, 93.) Here, appellant's interest under *Blakely* was a jury determination of the truth of the factors used to impose consecutive sentences and the upper term, as outlined above.

"Under existing law, a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent." (*People v. Scott, supra*, at 351, citing *People v. Cotton, supra*, 230 Cal.App.3d at 1085-1087 and *People v. Cropper, supra.*) There is no conceivable rational tactical justification under any imaginable set of circumstances for not arguing on behalf of appellant's rights to a jury determination of the factors used to impose consecutive sentences and the upper term. This court should therefore find that defense counsel's failure to raise a *Blakely* objection did not waive the issue, which is thus preserved for appellate review.

The court stated the following four aggravating factors as having influenced its sentencing decisions:

– appellant's prior convictions as an adult, and sustained petitions in juvenile delinquency proceedings, were numerous and increasing in seriousness;

– appellant was on probation when the crimes were committed;

– appellant's prior performance on probation or parole was unsatisfactory;

– appellant attempted to interfere with the judicial process, as evidenced by the tape recording of his jail house phone call to Manuel Jimenez. (3CT 868-869.)

-xxvii-

The court's findings on the aggravating factors are exactly the kind of offense-related aggravating factors which *Apprendi* and *Blakely* entrust to a jury. In view of the sentencing court's finding of aggravating factors, the court's selection of the upper term was tainted by *Blakely* error and reversal of appellant's sentence is required.

//

## CONCLUSION

For the reasons stated, appellant's convictions must be reversed

and/or the matter remanded for resentencing.

Dated: June 13, 2006.                          Respectfully submitted,

_____

BARBARA MICHEL
Attorney for appellant
Felipe Rosales Ruiz

## CERTIFICATE OF WORD COUNT

I hereby certify that, using a word-count program in the computer
which generated this document, I counted the words, and declare the total
words to be 8,108.

_____

BARBARA MICHEL

## DECLARATION OF SERVICE BY MAIL

I declare that I am over the age of 18 and not a party to the within action. My business address is P.O. Box 12535, Berkeley CA 94712. On the address given below, I declare that I served the within document by sending true and complete copies thereof in sealed envelopes, with first-class or priority postage affixed thereto, addressed to the following persons:

Mr. Felipe Rosales Ruiz, appellant

Attorney General, respondent
P.O. Box 944255
Sacramento CA 94244-2550

Central California Appellate Program
2407 J St., Suite 301
Sacramento CA 95816

Clerk's Office
Merced County Superior Court
for delivery to The Honorable Frank Dougherty, Judge
627 W. 21st St.
Merced CA 95340-3744

District Attorney
222 M St.
Merced CA 95340

Dominic Falasco, Esq.
525 J St. #A
Los Banos CA 93635

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Berkeley, California, on

_____
BARBARA MICHEL

FELIPE ROSALES RUIZ #J-06061
A.S.U. E-8
PELICAN BAY STATE PRISON
P.O. BOX. 7500
CRESCENT CITY. CA. 85532

RECEIVED

JUN 2 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Clerk's Office

UNITED STATES DISTRICT COURT FOR THE NORTHE
OF CALIFORNIA.
450 GOLDEN GATE AVE.
SAN FRANCISCO. CA 94102

2A

PELICAN BAY STATE PRISON
5905 Lake East Dr
Crescent City, CA 86532

